## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| JAMES HOWELL et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Docket No. 2:16-cv-438-NT |
| | ) |
| ADVANTAGE PAYROLL SERVICES, | ) |
| INC. et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER ON DEFENDANTS' MOTION TO DISMISS AND PLAINTIFFS' MOTION TO STRIKE

Before me is the Defendants' motion to dismiss Counts Four through Nine of the Plaintiffs' Complaint under Federal Rule of Civil Procedure 12(b)(6) and the Plaintiffs' motion to strike the Defendants' counterclaims under Federal Rule of Civil Procedure 12(f). Defs.' Mot. to Dismiss (ECF No. 6); Pl.'s Mot. to Strike (ECF No. 17). For the following reasons, the motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. The motion to strike is **DENIED**.

### LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss presents the question of whether the complaint states a sufficient claim for which relief may be granted. *Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 717 (1st Cir. 2014). To make this determination, courts in the First Circuit follow a two-step analysis. First, the court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Id*. Then, taking all well-

plead facts as true and "drawing all reasonable inferences in [plaintiff's] favor," the court must determine whether the complaint "plausibly narrate[s] a claim for relief." *Id.* "Plausible" means "more than a sheer possibility" but does not require all facts necessary to establish a prima facie case. *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013).

Generally, if the defendant introduces documents outside the pleadings, the court may only consider that material by converting the motion to dismiss into a motion for summary judgment. Fed. R. Civ. P. 12(d). However, a court may consider a document not attached to the complaint if it is "incorporated by reference in the complaint" or "integral to or explicitly relied upon in a complaint." *Jorge v. Rumsfeld*, 404 F.3d 556, 559 (1st Cir. 2005). "When the factual allegations of a complaint revolve around a document whose authenticity is unchallenged, 'that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).' " *Young v. Lepone*, 305 F.3d 1, 11 (1st Cir. 2002) (quoting *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998)).

## FACTUAL ALLEGATIONS

The Plaintiffs in this case are four payroll service companies ("**the Associates**")[1] that are franchisees of Defendant Advantage Payroll Services, Inc. ("**Advantage**"). Compl. ¶ 1 (ECF No. 1). Over approximately two decades, the Associates have developed into multimillion dollar businesses. Compl. ¶ 1.

---

[1]     The Associates are James Howell, of Advantage Payroll Services of Alabama; Ronald Rode, of Payroll Services, Inc. of Louisiana; Chase, Mozzicato, Patz, Inc. ("**CMP**") of Massachusetts; and Payroll Etc., Ltd. of Texas.

Advantage provides its franchisees with access to the Advantage System, a method for delivering computerized payroll and tax-payment services. Compl. ¶ 1. The general process is that the franchisees input their clients' data, Advantage processes it, and then the franchisees provide their clients with payroll checks or similar services. Compl. ¶ 18. Advantage led the Associates to believe that the Advantage System would be regularly updated and improved. Compl. ¶ 19.

Between 1986 and 1999, each of the Associates signed the standard Advantage Business Services, Inc. Associate License Agreement ("**Agreement**") to become Advantage franchisees. Agreements (ECF Nos. 6-1, 6-2, 6-3, 6-4, 6-5, 6-10). Each Agreement includes a provision regarding the "protected territory" in which the Associate's business is located. Agreement § I.C. This provision limits Advantage's ability to license additional payroll franchisees or to "directly process" new payroll clients in those territories. Agreement § I.C. The Agreement also bars the Associates from diverting business to competitors while the Agreement is in effect and from competing with Advantage for four years after the Agreement terminates. Compl. ¶ 26.

Each Agreement states that "this Agreement does not create a fiduciary relationship" between Advantage and the Associates. Agreement § XVII(A). However, the Associates trust Advantage to hold their funds in escrow and maintain confidential data about the Associates and their clients for the sole benefit of the Associates and their clients. Compl. ¶¶ 21, 23. The Associates also trust Advantage

to hold the proceeds of sales to the Associates' clients and remit net receipts to the Associates periodically. Compl. ¶ 24.

Each Agreement ran for a term of ten years and granted the Associate an option to renew for one additional ten-year term. Agreement § II.B. Each of the Associates has renewed its license and signed a Renewal Addendum to Advantage Business Services, Inc. Associate License Agreement ("**the Renewal Addenda**"), which extended each Associate's license for an additional ten-year term. Compl. ¶¶ 46-47; Renewal Addenda (ECF Nos. 6-6, 6-7, 6-8, 6-9, 6-11). The Renewal Addenda do not contain any language about additional renewals, but the Associates "understood and believed" that the Renewal Addenda included an additional ten year renewal option. Compl. ¶ 47.

In the past two decades, Advantage has gone through some notable changes. In 1998, Advantage shifted its focus away from franchising and toward a direct sales model. Compl. ¶ 23. Franchisees became a smaller relative source of revenue, but remained "an integral part of its overall business." Compl. ¶ 23. Then, in 2002, Defendant Paychex, Inc. ("**Paychex**"), a primary competitor, bought Advantage outright. Compl. ¶¶ 2, 29.

Following the sale, on October 9, 2002, Charles Lathrop, "who had been Advantage's Chairman and CEO and eventually became a Paychex employee," sent an email ("**the Lathrop Memo**") to all the Advantage franchisees to reassure them about their position. Compl. ¶ 32; ECF No. 6-12. The Lathrop Memo stated that: Paychex sales representatives had been told not to solicit the Associates' clients; they

would receive no commission or credit if Associates' clients became Paychex clients; and Paychex would "not tolerate any malicious representation regarding the nature of the Associate relationship or the future of the Advantage name and/or system." Lathrop Memo; Compl. ¶ 33. In addition, the Lathrop Memo came with an attached letter from Paychex Chairman Thomas Golisano, which the Memo stated would "explain[] Paychex'[s] ongoing support for the Associate channel." Lathrop Memo; Compl. ¶ 32. The Lathrop Memo further stated that the Memo and attached letter together "articulate[d] our continued commitment to our obligations under the License Agreements." Lathrop Memo.

Relying on the Lathrop Memo's assurances, the Associates renewed their Agreements between 2004 and 2009 and continued to invest in their businesses. Compl. ¶ 35. However, the Associates have discovered that since the 2002 purchase, Paychex has "engaged in a long-term strategy to put the Associates out of business, and to capture for itself all Advantage- and Associate-owned client relationships supported by the Advantage System." Compl. ¶ 3. The number of Advantage franchises has dropped from fifteen in 2002 to six. Compl. ¶ 36.

The remaining Associates want to continue to operate their franchises but face what they characterize as various forms of pressure from Paychex to close. Compl. ¶ 57. First, the Paychex takeover has harmed the Advantage brand. Compl ¶ 43. Senior officers at the Paychex headquarters in New York are now also the senior officers for Advantage. Compl. ¶¶ 37, 38. Advantage sales, technical support, and payroll processing are now handled by Paychex personnel. Compl. ¶ 36. In addition,

Advantage is converting its non-franchise clients to the Paychex platform, and, recently, when Paychex employees have emailed Associates' clients on behalf of Advantage, they have used their @paychex.com email address. Compl. ¶¶ 43, 44. These practices create the impression among the Associates' clients and others that Paychex and Advantage are one company. Compl ¶ 43.

Second, the Associates believe that Paychex/Advantage sales representatives have been "actively soliciting" the Associates' clients in the Associates' protected territories. Compl. ¶ 42. The 2002 sale granted Paychex access to the Associates' confidential client information and the "tools of their craft." Compl. ¶¶ 2, 30. And "in most cases" the Associates have had "no practical way" to determine whether their clients who moved to Paychex received improper solicitations. Compl. ¶ 41.

Third, despite the reduction in investment in the Advantage System, "Paychex has increased the wholesale price charged by Advantage to the Associates by 4% almost every year." Compl. ¶ 40.

Fourth, Paychex has indicated it will not renew the Associates' contracts going forward. Compl. ¶¶ 3, 47. In 2014, Howell attempted to renew his twenty-year-old franchise for a third ten-year term, but Advantage only agreed to a series of short term renewals. Compl. ¶ 48. In 2016, Payroll Etc. also attempted to renew its franchise for an additional ten-year term, but Advantage agreed only to a six-month renewal. Compl. ¶¶ 53, 54. The remaining Associates assert that they have renewal options and want to exercise them. Compl. ¶ 57. The Associates believe that the purpose of the short term renewal strategy is to "promote uncertainty and bring

6

maximum pressure on the Associates to abandon their franchises or sell their business to Paychex for less than fair value." Compl. ¶ 55.

Finally, Advantage's efforts to update and improve the Advantage System and remain competitive have effectively ceased. Compl. ¶ 39. The Associates have been forced to engage outside vendors for supplemental products and services, which do not integrate fully with the Advantage System. Compl. ¶ 40. Paychex told the Associates that it intends to shut down the Advantage System in approximately three years, which coincides with the expiration of the remaining Agreements. Compl. ¶¶ 3, 50. Because the Associates rely on the Advantage System, they believe this would force them out of business and allow Paychex to take over their accounts. Compl. ¶ 3. Paychex also has indicated to the Associates that, in the alternative, it may continue to operate the Advantage System, but only for the purpose of moving all of the Associates' clients over to the Paychex system. Compl. ¶¶ 3, 51.

The Complaint references and relies upon the Agreements, the Renewal Addenda, and the Lathrop Memo. The Defendants attached these documents to their motion to dismiss. Because the Plaintiffs do not challenge the authenticity of the Defendants' attachments, I will consider them in my analysis of the motion to dismiss. *See Young v. Lepone*, 305 F.3d 1, 11 (1st Cir. 2002).

## DISCUSSION

The Defendants move to dismiss Counts Four through Nine.[2] The unaddressed Counts One through Three seek declaratory judgment regarding the scope and enforceability of the contractual right to renewal, the restrictive covenants, and the assignment of franchisee clients back to Advantage upon termination of the franchise. Compl. ¶¶ 61-80.

Before reaching the substantive analysis, I must address the choice of law. The Defendants claim that Maine law governs. They note that the Agreements contain a choice of Maine law clause and that matters before this Court under diversity jurisdiction are subject to Maine choice of law rules, which favor enforcing contractual choice of law provisions where the parties regularly conduct business in Maine. Defs.' Mot. to Dismiss 6. The Plaintiffs "do not concede" that Maine law applies, but "assume *arguendo*" that Maine law applies for the purposes of this motion. Accordingly, I will apply Maine law.

---

[2]      The Plaintiffs assert that the Defendants waived their right to file a 12(b)(6) motion because they filed their Answer to the Complaint before filing their motion to dismiss. Pls.' Opp'n 4-5 (ECF No. 18). A motion under 12(b) "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b); *see also* 5C Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1361 (3d ed.) ("If the defendant decides to assert a Rule 12(b) defense by motion, then he must do so before filing the answer."). Technically, it was improper for the Defendants to first file an Answer and then move to dismiss under Federal Rule of Civil Procedure 12(b)(6). However, courts have not interpreted this timing provision strictly. Where, as here, the Defendants filed their motion to dismiss just minutes after their Answer, disallowing the 12(b)(6) motion would be an unfair elevation of form over substance. As other judges in this District have done, I treat the motion to dismiss as being filed simultaneously with the Answer, and I find that the Defendants have not waived their right to file a 12(b)(6) motion. *See Thayer Corp. v. Reed*, No. 2:10-423, 2011 WL 2682723, at *3-4 (D. Me. Jul. 11, 2011); *McCarthy v. Inhabitants of Town of Kennebunkport*, 366 F. Supp. 2d 165, 166 n.2 (D. Me. 2005).

I.     **Counts Four, Six, Seven, Eight, and Nine**

The Defendants move to dismiss counts four, six, eight, and nine—asserting breaches of contract, breaches of fiduciary duty, tortious interference, and false representations, respectively—on the grounds that they fail to state plausible claims upon which relief can be granted.

A.     **Count Four—Breaches of Contract**

In Count Four, the Plaintiffs assert that Advantage breached the contracts in four ways: (i) by failing to recognize the Associates' renewal rights under the Agreements § II.B (the "renewal" breach); (ii) by failing to pay the Associates, as required by § IV.B of the Agreements, income from interest earned on payroll deposits of the Associates' clients during the "float" period when the Defendants held the clients' money (the "float" breach); (iii) by directly processing new payroll clients in the protected territories in violation of § I.C of the Agreements (the "poaching" breach); and (iv) by breaching the terms of the Lathrop Memo by soliciting the Associates' clients and causing them to switch to Paychex (the "Lathrop" breach). Compl. ¶¶ 81-86.

The Defendants make no effort to dismiss the renewal breach claim. They contend that the float, poaching, and Lathrop breach claims should be dismissed or at least temporally limited.  Defs.' Mot. to Dismiss 6-7. I consider the Defendants' temporal limitation argument first. The Defendants note that under the terms of the Renewal Addenda, the Plaintiffs unconditionally released "any and all claims or demands" that relate to the Agreement up through the date they signed the

Addenda.[3] Defs.' Mot. to Dismiss 7. Also, the Defendants contend that some of the Agreements at issue contain a one-year limitations period, and for those agreements, claims that arose prior to August 26, 2015, (one year before the Associates filed the Complaint) are barred.[4]

The Associates assert that the alleged breaches of contract "occurred in 2014 or later" and "continued right up to the filing of this litigation." Pls.' Opp'n 7-8. The Complaint alleges that Advantage "failed to remit to the Associates the income derived from . . . the interest earned on the payroll deposits of the Precision's clients" and is "actively soliciting business" in the protected territories. Compl. ¶¶ 42, 83. The Associates also contend that the discovery rule and doctrines of equitable tolling could apply to defeat any statute of limitations defense. Pls.'s Opp'n 8.

"Where the dates included in the complaint show that the limitations period has been exceeded and the complaint fails to 'sketch a factual predicate' that would warrant the application of either a different statute of limitations period or equitable estoppel, dismissal is appropriate." *Santana–Castro v. Toledo–Davila*, 579 F.3d 109, 113-14 (1st Cir. 2009) (quoting *Trans-Spec Truck Service, Inc. v. Caterpillar Inc.*, 524 F.3d 315, 320 (1st Cir. 2008); *see also Richards v. City of Bangor*, 878 F. Supp. 2d 271,

---

[3]     Plaintiff Howell's Renewal Addendum is dated February 1, 2006. (ECF No. 6-6). Plaintiff CMP's Renewal Addendum is dated February 15, 2007. (ECF No. 6-7). Plaintiff Payroll Etc.'s Renewal Addenda are dated November 14, 2006. (ECF Nos. 6-8, 6-9)). Plaintiff Rode's latest Renewal Addendum is dated September 13, 2009. (ECF No. 6-11).

[4]     Advantage included a one-year limitations period in the Agreements § XXII with Howell, CMP, and Payroll Etc.-Lubbock, as well as Rode's first Renewal Addendum. (ECF Nos. 6-1, 6-2, 6-4, 6-10). There is no one-year limitations period in Advantage's initial Agreements with Payroll Etc.-Midland or with Rode. (ECF Nos. 6-3, 6-5). To the extent Payroll Etc. or Rode allege a viable claim with respect to these contracts, the Defendants contend that Maine's six-year statute of limitations governs. *See* 14 M.R.S.A. § 752 (2003).

276 (D. Me. 2012) ("[f]acts supporting the [limitations] defense should be clear on the face of the plaintiff's pleadings."). The Plaintiffs have alleged breaches of contract that fall within even the shortest one-year statute of limitations. While the Defendants' temporal arguments may be relevant to the breadth of discovery, they do not support dismissal of Count Four for failure to state a claim.

The Defendants separately argue that the Lathrop Memo is not a contract and therefore cannot be the basis of a breach of contract claim. Defs.' Mot. to Dismiss 9. In their opposition, the Plaintiffs seem to refine their Count Four claim: "the only inquiry is whether the allegations in the Complaint with respect to the Lathrop Memo support the Associates' claim that Advantage has breached its obligations under the Franchise Agreements." Pls.'s Opp'n 10. Even if the Lathrop Memo does not stand on its own as a contract, other parts of Count Four do state plausible claims for relief. The issue of how to treat the Lathrop Memo will benefit from further factual development and can be addressed at a later stage in the proceedings.

Accordingly, the motion to dismiss Count Four will be denied.

### B.    Count Six—Breaches of Fiduciary Duty

Count Six alleges breaches of fiduciary duty against Advantage and Paychex, and the Defendants assert that they owe no such duty to the Associates. The elements of a fiduciary relationship are (i) the "actual placing of trust and confidence in fact by one party in another" and (ii) "a great disparity of position and influence between the parties." *Combined Energies v. CCI, Inc.*, 628 F. Supp. 2d 226, 238 (D. Me. 2009) (quoting *Bryan R. v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 738 A.2d 839, 846 (Me. 1999)).

As a general rule, a fiduciary duty does not arise from a franchise relationship. *Combined Energies*, 628 F. Supp. 2d at 238. However, the facts in an exceptional situation may give rise to a fiduciary duty. Maine law requires that, "to survive a motion to dismiss a claim for breach of fiduciary duty, the plaintiff must set forth specific facts constituting the alleged relationship with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship." *Bryan R.*, 738 A.2d at 846-47.

Here the Plaintiffs assert that they trusted Advantage to handle their clients' payments, distribute payment shares to the Associates, and guard confidential information about the Associates and their clients. Compl. ¶¶ 21-24, 93. In addition, they allege that Advantage has superior position and influence because it is the locus of company management and finances, and it maintains the corporate brand and Advantage System. Compl. ¶¶ 93, 95. These allegations alone likely are insufficient to take this case out of the general rule against fiduciary liability for franchisors.

In this case, the Associates face an additional barrier. The Agreements signed by the Associates expressly disclaim that the contracts created a fiduciary relationship. Agreement § XVII(A). Courts have upheld similar fiduciary disclaimers where the contract provision was clear and unambiguous. *First NH Banks Granite State v. Scarborough*, 615 A.2d 248, 250 (Me. 1992) (finding no fiduciary relationship where, inter alia, a creditor-debtor commitment letter disclaimed a fiduciary relationship); *Cooper v. Parsky*, 140 F.3d 433, 439 (2d Cir. 1998) (holding that a party "may not sue upon a duty that was expressly excluded from the Agreement"); *Summit*

12

*Properties Int'l, LLC v. Ladies Prof'l Golf Ass'n*, No. 07-10407, 2010 WL 2382405, at *7 (S.D.N.Y. June 14, 2010) (listing cases); *cf. Burten v. Milton Bradley Co.*, 763 F.2d 461, 464 (1st Cir. 1985) (reciting the rule that "express disclaimer by the disclosee of a confidential relationship from the outset will dispel the existence of such a relationship," but finding the disclaimer agreed to by the parties was not express).

In light of the parties' express disavowal of a fiduciary relationship and the absence of an allegation that the contracts were ambiguous and should not control or that they were not arms-length agreements between sophisticated business people, the Associates have not established a plausible basis for fiduciary liability. Accordingly, the motion to dismiss Count Six will be granted.

### C.    Count Eight – Tortious Interference

Count Eight accuses Paychex of tortious interference with the contracts or relationships between the Associates and Advantage, as well as those between the Associates and their clients. Compl. ¶¶ 103-107. A tortious interference claim requires "(1) that a valid contract or prospective economic advantage existed; (2) that the defendant interfered with that contract or advantage through fraud or intimidation; and (3) that such interference proximately caused damages." *Combined Energies*, 628 F. Supp. 2d at 229; *Currie v. Indus. Sec., Inc.*, 915 A.2d 400, 408 (Me. 2007).

The second element of tortious interference requires fraud or intimidation. The five elements necessary to establish fraud are (i) a false representation (ii) of a material fact, (iii) with knowledge of its falsity or reckless disregard for whether it is true or false, (iv) for the purpose of inducing another to act in reliance on the

representation, and (v) the other justifiably relies to her detriment. *Combined Energies*, 628 F. Supp. 2d at 229; *Rutland v. Mullen*, 798 A.2d 1104, 1111 (Me. 2002); *see also* Restatement (Second) of Torts §§ 525-30 (1977). Intimidation in this context means coercion, extortion, or other conduct that " 'mak[es] it clear' to the party with which the plaintiff had contracted that the only manner in which that party could avail itself of a particular benefit of working with defendant would be to breach its contract with plaintiff." *Rutland*, 798 A.2d at 1111 (quoting *Pombriant v. Blue Cross/Blue Shield of Me.*, 562 A.2d 656, 659 (Me. 1989)); *Currie*, 915 A.2d at 408.

Federal Rule of Civil Procedure 9(b) requires that an allegation of fraud state the facts of the fraud "with particularity," meaning the "time, place and content of an alleged false representation." *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985). The plaintiff may allege the defendant's intent or knowledge generally. Fed. R. Civ. P. 9(b).

Count Eight fails to identify any interference by "fraud" or "intimidation." The assertion "Paychex was aware of the contracts referenced above, and interfered with such contracts through unlawful or improper means" is conclusory and must be disregarded. Compl. ¶ 105; *see Carrero-Ojeda*, 755 F.3d at 717. The subsequent assertion that "Paychex caused Advantage to breach its contracts with the Plaintiffs by processing . . . new payroll clients in the Protected Territories" provides some specificity about which provision was allegedly breached, but not any of the elements of fraud or intimidation. Compl. ¶¶ 44, 106. Similarly, the allegation that "Paychex also caused certain of the Plaintiffs' clients to switch from the Advantage System to

14

products and services offered by Paychex, either directly or through its complete control over Advantage" fails to develop the elements of fraud or intimidation. Compl. ¶ 106.

In their opposition to the motion to dismiss, the Associates point to additional instances of interference, but they again fail to identify either indications of fraud and intimidation or of specific contracts with clients. Pls.' Opp'n 17-18. For example, the Associates reiterate the allegation that Paychex sales representatives emailed the Associates' clients on behalf of Advantage from their Paychex email address and that this created the impression that Advantage and its Associates are going out of business. *See* Compl. ¶ 43. The Plaintiffs also assert that Paychex "cause[d] confusion among the Associates' clients and adversely affect[ed] the Associates' ability to compete for new clients." Compl. ¶ 43. These examples fail to provide specific facts about any particular business relationships or interference by fraud or coercion.

Finally, the Plaintiffs point to the Lathrop Memo and commitments given by Paychex[5] to the Associates that Paychex sales representatives would not solicit the Associates' clients or sully the Advantage name. *See* Compl. ¶ 109. The Plaintiffs claim that Lathrop's assurances, which were reiterated over 14 years and as recently as 2016, were false and the Associates relied on them when they made their decisions

---

[5] The Defendants object that the Lathrop memo was not a Paychex representation at all because it came from an Advantage official. Indeed, the Plaintiffs' assertion that the Lathrop Memo representations were made "by or on behalf of" Paychex is not expressly substantiated. Drawing all alleged facts in the Plaintiffs' favor, however, I can make the inference that the Lathrop Memo was a Paychex representation because the Memo was sent after Paychex bought Advantage, addressed Paychex sales conduct, and came with an affirming letter from Paychex Chairman Thomas Golisano. Thus, the Lathrop Memo may stand as a plausible Paychex representation at this stage in the proceeding.

to renew their Agreements. But the Complaint contains no facts to suggest that the Lathrop Memo was false when it was made, or that Paychex had knowledge or recklessly disregarded its falsity. Further, it is not plausible that an email written by Lathrop in 2002 would years later induce the Associates to renew their Agreements. Although the Plaintiffs claim that similar statements were repeated over 14 years, they fail to provide any further details, and thus they fail to meet the specificity required by Rule 9(b). Without facts regarding fraud or intimidation, Count Eight does not state a plausible claim for tortious interference. Accordingly, Count Eight will be dismissed.

### D.    Count Nine—Misrepresentation

Count Nine alleges intentional and negligent misrepresentation claims against Paychex. Compl. ¶¶ 109-10. Intentional misrepresentation is considered "a species of fraud," and sufficient pleadings must be stated with particularity. *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004). A negligent misrepresentation claim may be established against one who, in the (i) course of business or a transaction in which he has a pecuniary interest, (ii) supplies false information without reasonable care or competence, (iii) for the guidance of others in their business transactions, and (iv) the other party justifiably relies on the information (v) to her detriment. *Rand v. Bath Iron Works Corp.*, 832 A.2d 771, 774 (Me. 2003) (citation omitted); *see also* Restatement (Second) of Torts § 552(a) (1977).

The Complaint alleges:

> Pursuant to the Lathrop Memo, Paychex represented that it was committed to maintaining the Advantage System and causing Advantage to honor its commitments under the Franchise Agreements.

16

> Specifically, Paychex represented to the Plaintiffs that its sales representatives had been instructed "not to solicit" any clients serviced by the Plaintiffs, that its sales representatives would receive "no commission or sales credit" if the Plaintiffs' clients became clients of Paychex, and that Paychex would "not tolerate any malicious misrepresentation regarding the nature of the Associate relationship or the future of the Advantage name and/or system."

Compl. ¶ 109; *see also* Compl. ¶¶ 32-33. The Complaint further alleges Paychex repeated the Lathrop Memo representations "many times over the last 14 years, including as recently as 2016," and that all of these representations were:

> (a) false, (b) made by or on behalf of Paychex, (c) material to the Plaintiffs' decision to renew their Franchise Agreements, (d) material to the Plaintiffs' decisions to continue to operate and invest money in their franchise, (e) intended to induce action or forbearance on the part of the Plaintiffs, and (f) knowingly false or made with reckless disregard for the truth, or, in the alternative, communicated to the Plaintiffs without reasonable care or competence.

Compl. ¶ 110.

The Plaintiffs do little more than plead the black letter elements. For the reasons stated in the section on Count Eight, I conclude that Count Nine fails to plausibly allege a claim for intentional or negligent misrepresentation. *See Grant v. Target Corp.*, 126 F. Supp. 3d 183, 191 (D. Mass. 2015) (dismissing a misrepresentation claim where the plaintiff "plead no facts plausibly suggesting that the[] statements were false when made, or that [the defendant] knew of or recklessly disregarded their falsity."); *see also Cutler v. Rancher Energy Corp.*, No. 13-906, 2014 WL 1153054, at *7 (C.D. Cal. Mar. 11, 2014) (finding that the complaint failed to satisfy the *Twombly* pleading standard because it does not adequately establish that the Defendant lacked reasonable grounds for believing his statements were true).

Accordingly, the Associates fail to state a claim of intentional or negligent misrepresentation for which relief can be granted, and Count Nine will be dismissed.[6]

## II.    Counts Five and Seven—Relief

The Defendants also seek to dismiss Count Five, which is styled "Declaratory Judgment – Protected Territories" and Count Seven, which is entitled "Alter Ego/Veil Piercing." I treat the motion to dismiss these counts separately from the others because technically they are not separate causes of action. Count Five seeks alternative relief against Advantage and Paychex, and Count Seven sets forth an alternative theory of liability that, if successful, would make Paychex liable for actions of Advantage.

Under Rule 8(a), "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief; and a demand for the relief sought, which may include relief in the alternative or different types of relief." Rule 8(d)(1) specifically states: "Each allegation must be simple, concise and direct. No technical form is required." And Rule 8(d)(2) states: "A party may set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count . . . or in separate ones." Although it makes things easier to analyze when each count of a complaint demarks a separate substantive cause of

---

[6]       This determination leaves only breach of contract claims in the Complaint. "Contract damages are more limited than compensatory damages for a tort and, '[n]o matter how egregious the breach, punitive damages are unavailable under Maine law for breach of contract.' " *Stull v. First Am. Title Ins. Co.*, 745 A.2d 975, 981 (Me. 2000) (quoting *Drinkwater v. Patten Realty Corp.*, 563 A.2d 772, 776 (Me. 1989)).

action, plaintiffs are not required to set forth their complaint in any particular manner.

### A.    Count Five—Declaratory Judgment

In Count Five, the Associates seek a declaratory judgment that "every sale to a new client in a Protected Territory by an Advantage/Paychex sales representative constitutes a breach of the Franchise Agreement." Compl. ¶ 90. The Defendants argue that Count Five should be dismissed as superfluous because it is "almost identical" to the Count Four breach of contract claim and the Count Seven claim that Advantage is the alter ego of Paychex.[7] Defs.' Mot. to Dismiss 10; Defs.' Reply 7 (ECF No. 29). The Plaintiffs argue that Count Five seeks forward looking equitable relief and related "necessary and proper relief" under 28 U.S.C. § 2201 that was not requested in Count Four. Further, Count Five adds Paychex as a Defendant.

The First Circuit has explained that the Declaratory Judgment Act "28 U.S.C. § 2201(a), creates a remedy, not a cause of action." *Buck v. American Airlines, Inc.*, 476 F.3d 29, 33 n.3 (1st Cir. 2007). The Act allows district courts the discretion to grant declaratory relief, but it "presupposes the existence of a judicially remediable right." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960). So although Count Five is set

---

[7]    Pursuing a similar theory, the Plaintiffs move to strike the Defendants' three counterclaims as redundant. Pls.' Mot. to Strike (ECF No. 17). Courts have considerable discretion under Federal Rule of Civil Procedure 12(f) to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *See Alvarado–Morales v. Digital Equip. Corp.*, 843 F.2d 613, 618 (1st Cir. 1988). Rule 12(f) motions are disfavored and "rarely granted absent of showing of prejudice to the moving party." *Sebunya v. Holder*, No. 12-67, 2012 WL 5993160, at *1 (D. Me. Nov. 30, 2012) (internal quotation marks omitted); *see also Zurich Am. Ins. Co. v. Watts Regulator Co.*, 796 F. Supp. 2d 240, 246 (D. Mass. 2011). Here, the Defendants' counterclaims seek a declaratory judgment that their interpretation of the contract is the correct one, and the counterclaims would not necessarily be rendered moot by the adjudication of the Plaintiffs' claims. *See* 6 Alan Wright & Arthur Miller Fed. Prac. & Proc. Civ. § 1406 (3d ed.). The motion to strike is therefore **DENIED**.

forth as a free-standing claim, I will treat it as a separate request for relief. As such, the relief requested in Count Five is not entirely redundant to Count Four, and it is not appropriate at this stage to treat the Count as superfluous. The motion to dismiss Count Five will be denied.

### B.   Count Seven—Alter Ego/Veil Piercing

Under Count Seven, the Associates claim that the Court should pierce the corporate veil under an alter ego theory to hold Paychex jointly and severally liable for all relief entered against Advantage. Compl. ¶¶ 98-102.  In Maine, "[a]s a matter of public policy, corporations are separate legal entities with limited liability." *GMAC Comm. Mortg. Corp. v. Gleichman*, 84 F. Supp. 2d 127, 140 (D. Me. 1999) (internal quotation marks omitted). A court may nonetheless pierce the corporate veil "when equity so demands, and may disregard the corporate entity 'when used to cover fraud or illegality, or to justify a wrong.' " *Johnson v. Exclusive Props. Unlimited*, 720 A.2d 568, 571 (Me. 1998) (quoting *Anderson v. Kennebec River Pulp & Paper Co.*, 433 A.2d 752, 756 n.5 (Me. 1981)).

Piercing the corporate veil is, as the Defendants note, not a cause of action itself, but rather an equitable remedy that allows a court to disregard a corporate entity and award relief against the individual or entity behind the veil.[8] *Mitsubishi Caterpillar Forklift America, Inc. v. Superior Serv. Ass'n, Inc.*, 81 F. Supp. 2d 101,

---

[8]      Although the alter ego theory often is used to unveil an individual hiding behind a corporate form, the doctrine can also be used in other contexts. "Where all the elements of a de facto merger exist except that the predecessor corporation is not dissolved but rather is a wholly-owned subsidiary stripped of all its assets for the exclusive benefit of its successor-parent and operated as a mere instrumentality of the parent, the parent may be held responsible for the liability of the subsidiary by piercing the corporate veil." 15 Fletcher Cyclopedia of the Law of Corporations § 7124.20 (2016).

112-13 (D. Me. 1999); *Paper Allied-Industrial, Chemical and Energy Workers Inter. Union v. Sherman Lumber Co.*, No. 00-41, 2001 WL 1719233, at *8 (Me. Super. June 28, 2001). Although Count Seven does not set forth a separate cause of action, it does put the Defendants on notice that the Plaintiffs will be pursuing Paychex under an alter ego theory. I treat Count Seven as an alternate claim for relief against Paychex.

Whether to pierce the veil requires a fact-intensive, case-by-case analysis. *Crane v. Green & Freedman Baking Co.*, 134 F.3d 17, 21 (1st Cir. 1998) ("The legal standard for when it is proper to pierce the corporate veil is notably imprecise and fact-intensive."). For me to consider Advantage and Paychex as one entity, the Associates must show (i) an abuse or misuse of the corporate form and (ii) an unjust or inequitable result would occur if I recognize the corporate separateness of Advantage and Paychex. *GMAC Comm. Mortg. Corp.*, 84 F. Supp. 2d at 140. At this early stage, the Associates have plead sufficient facts to support an alter ego theory.[9] The motion to dismiss Count Seven will be denied.

## III.   Leave to File an Amended Complaint

The Associates, perhaps seeing the vulnerability of their Complaint, seek leave to amend. Pls.' Opp'n 2, 18, 19. As a general rule, a court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Here, the Plaintiffs filed

---

[9]     Here, the alleged abuse is that Advantage has been reduced to a "shell" corporation. Paychex controls Advantage's management, accounting, and sales teams. Compl. ¶¶ 1-4, 36-44. And Paychex is using its control of Advantage to promote Paychex products, degrade the value of the Associates' products, and generally reduce competition with Advantage and the Associates. Compl. ¶ 38. Meanwhile, Advantage's clients are being transitioned to the Paychex platform, and Advantage's resources have been redirected to Paychex. Compl. ¶ 38. The Complaint concludes that this cumulative reorientation of Advantage's operations constitutes a breach of Advantage's obligations to the Associates, at the hands of Paychex. Compl. ¶ 101.

their opposition and request to amend on October 18, 2016, before the November 15, 2016, deadline for amendment. *See* Scheduling Order 2 (ECF No. 28). The Plaintiffs are hereby granted leave to amend.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss as follows:

- On Count Four, the Court **DENIES** the motion to dismiss.

- On Count Five, the Court **DENIES** the motion to dismiss.

- On Count Six, the Court **GRANTS** the motion to dismiss.

- On Count Seven, the Court **DENIES** the motion to dismiss.

- On Count Eight, the Court **GRANTS** the motion to dismiss.

- On Count Nine, the Court **GRANTS** the motion to dismiss.

The Court **DENIES** the motion to strike.


SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 28th day of February, 2017.